**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

UNITED STATES OF AMERICA,
EX REL, THOMAS A. BERG, TIMOTHY
A. BERG, RYNE J. LINEHAN, NAYER M.
MAHMOUD, and STANLEY E. SMITH,

                         Plaintiffs,

    v.

HONEYWELL INTERNATIONAL, INC.,
and HONEYWELL, INC.,

                         Defendants.

Case No. 3:07-cv-00215-SLG

## <u>ORDER RE CROSS MOTIONS FOR SUMMARY JUDGMENT</u>

Before the Court are Defendants' Motion for Summary Judgment at Docket 220 and Relators' Motion for Partial Summary Judgment at Docket 225. The motions have been fully briefed;[1] oral argument was held on October 17, 2016.[2]

This is the third time the Court has addressed dispositive motions in this case. The Ninth Circuit has twice sent this case back to the district court following orders granting motions to dismiss based solely on the allegations pled by Relators.[3] In contrast to the prior motions to dismiss, the motions before the Court at this juncture are motions for summary judgment; the Court's disposition of these motions is based on its review of the extensive submissions of the parties regarding these motions, which

---

[1] *See* Docket 222 (Defs.' Mem.); Docket 303-1 (Relators' Unredacted Opp.); Docket 258 (Defs.' Reply); Docket 302-1 (Relators' Corrected Mem.); Docket 238 (Defs.' Opp.); Docket 276 (Relators' Corrected Reply). Relators also filed a Notice of Supplemental Authority at Docket 292.

[2] *See* Docket 287 (Hr'g Mins.); Docket 296 (Hr'g Tr.).

[3] *See* 580 Fed. App'x 559 (9th Cir. 2014); 502 Fed. App'x 674 (9th Cir. 2012).

consists of thousands of pages of documentary evidence and excerpts from over a dozen depositions.

## BACKGROUND

In the late 1990s the Army sought to privatize the utilities at U.S. Army installations.[4]  Simultaneously, but as a separate initiative, the Army endeavored to increase the energy efficiency of its buildings and facilities.[5]  In 1986, Congress authorized government agencies to enter into Energy Savings Performance Contracts ("ESPC"), whereby the agency could use the savings from an efficiency upgrade to pay for that upgrade.[6]  Pursuant to this law, a private contractor would install and maintain Energy Cost Savings Measures ("ECSM"), finance their installation, and receive compensation from the government for years into the future based on verified savings from the measures it had installed.[7]  By statute, payments to a contractor in a given year cannot exceed "the amount that the agency would have paid for utilities without an [ESPC]" during that year.[8]  Federal law also requires that the contract "provide for a guarantee of savings to the agency."[9]  It is these types of contracts that underlie this case.

---

[4] Docket 319-1 at 4.

[5] Docket 223-18 at 2.

[6] Docket 223-18 at 2; 42 U.S.C. § 8287 *et seq.*

[7] *See* Docket 223-18 at 2.

[8] 42 U.S.C. § 8287(a)(2)(B).

[9] *Id.*

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 2 of 37

As part of the privatization initiative, beginning in 1999 the Fort Richardson Army base in Anchorage, Alaska ("FRA") contemplated shutting down its central heating and power plant ("CHPP") and instead buying its electricity from a commercial provider.[10] At around the same time, FRA reached out to Honeywell, Inc. to explore options for improving its buildings' energy efficiency.[11] Honeywell had previously entered a contract with the U.S. Army making it the contractor for ESPCs for an extendable five year term.[12] Under that "umbrella" Indefinite-Delivery Indefinite-Quantity contract ("IDIQ"), Honeywell could propose ESPCs that the government could accept by issuing a "Task Order" under the IDIQ.[13] In 2000, Honeywell proposed two ESPCs—referred to as Proposal #3 and Proposal #4—to improve FRA's energy efficiency.[14] It developed these proposals with the understanding that FRA planned to cease generating its own electricity and would instead buy its electricity from a third-party provider.[15] Honeywell's proposals included estimates of the costs of installation, the current costs of electricity and heating for the base, and the projected costs of electricity and heating after the

---

[10] Docket 319-1 at 4 (Paul Knauff Aug. 21, 2002 Information Paper).

[11] Docket 223-18 at 6 (Col. Mark C. Nelson Mem.).

[12] *See* Docket 225-1 (IDIQ) at 1–3.

[13] Docket 225-1 at 3, 103–04 (ordering clause).

[14] *See* Docket 225-5 (Proposal #3); Docket 265-5 (Proposal #4). The two proposals were similar in their recommended improvements, but each concerned a distinct group of buildings on FRA.

[15] *See* Docket 223-18 at 56 (Nov. 29, 1999 email from Suzanne Wunsch) (inquiring whether FRA intended to close CHPP); Docket 265-10 (Jan. 6, 2000 IST Presentation) at 13 (stating Honeywell's assumption that FRA would "convert from central to distributed heating); Docket 265-12 (Feb. 29, 2000 IST Presentation) at 12 (identifying increased electrical costs from shutting CHPP); Docket 265-12 at 14 (identifying ancillary savings from shutting down CHPP).

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 3 of 37

efficiency measures had been installed and the CHPP shuttered. Honeywell prepared detailed calculations setting out how it arrived at its estimates, which it shared with both FRA personnel and Army Corps of Engineers staff in Huntsville, Alabama.[16]

As the proposals were developed, there were extensive discussions between Honeywell's engineers and the engineers at Huntsville about the basis and reasonableness of certain calculations. Over time, these issues were resolved in multilateral meetings and exchanges. Honeywell submitted several revised drafts containing certain amended calculations during the course of these discussions.[17] Ultimately, the Army accepted Honeywell's proposals for FRA in late 2000; Proposal #3 became formalized as Task Order 8 and Proposal #4 became formalized as Task Order 9.[18]

Over the next few years, questions arose as to whether FRA could pay the contract amounts because its actual savings were less than projected.[19] Because the statute authorizing ESPCs limits payments to actual savings, Army lawyers were concerned that making the payments would violate the Anti-Deficiency Act.[20] Honeywell and the government renegotiated and combined the two task orders in 2003.[21] Honeywell received its first payments thereafter, pursuant to the renegotiated

---

[16] See, e.g., Docket 241-30 at 32–36; Docket 223-22 at 4–10; Docket 223-23 at 10–34.

[17] See, e.g., Docket 241-26 at 9–34; Docket 223-2 at 32–35.

[18] Docket 225-2 at 1–3; Docket 225-3 at 1–3.

[19] See Docket 319-3 at 2.

[20] See, e.g., Docket 223-38 at 45 (Simmons Mem.). See 31 U.S.C. § 1341.

[21] Docket 223-42 at 2–20; see also Docket 265-21 (Bridgeman Dep.) at 3. This renegotiated

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 4 of 37

contract.[22]   After unsuccessfully pursuing internal channels,[23] Relators initiated this action in 2007, alleging that in 2000 Honeywell fraudulently obtained Task Orders 8 and 9.   According to Relators, this initial fraud also induced the government to enter the 2003 modification and thus, Relators allege, the government's payments pursuant to that modification were fraudulently induced in violation of the FCA.[24]

## DISCUSSION

### I. Jurisdiction

The Court has jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims arise under the False Claims Act, 31 U.S.C. § 3729 *et seq*.

### II. Standard for Summary Judgment

Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  The burden of showing the absence of a genuine dispute of material fact initially lies with the moving party.[25]  If the moving party meets this burden, the non-moving party must present specific factual evidence demonstrating the existence of a genuine issue of fact.[26]  The non-moving party may

---

contract is referred to as "Mod II."  It combined the two task orders into a single contract.
Honeywell and the government had previously modified Task Order 8 to adjust the buildings
within its scope.  *See* Docket 223-41 at 14 (documenting "modification 01").

[22] *See* Docket 223-45 at 2.

[23] *See, e.g.*, Docket 223-45 at 4–5.

[24] *See* Docket 1.  The operative complaint for purposes of these motions is the Second
Amended Complaint (SAC) at Docket 101, filed Aug. 13, 2014.

[25] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[26] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 5 of 37

not rely on mere allegations or denials. Rather, that party must demonstrate that enough evidence supports the alleged factual dispute to require a finder of fact to make a determination at trial between the parties' differing versions of the truth.[27]

When considering a motion for summary judgment, a court views the facts in the light most favorable to the non-moving party and draws "all justifiable inferences" in the non-moving party's favor.[28] When faced with cross-motions for summary judgment, the court "review[s] each separately, giving the non-movant for each motion the benefit of all reasonable inferences."[29] To reach the level of a genuine dispute, the evidence must be such "that a reasonable jury could return a verdict for the non-moving party."[30] If the evidence provided by the non-moving party is "merely colorable" or "not significantly probative," summary judgment is appropriate.[31]

To prevail on summary judgment, Relators must show that there is no genuine dispute of material fact as to each element of their claim and that they are entitled to judgment as a matter of law based on those undisputed facts.[32] But for Honeywell to prevail, it must show only that there is no genuine dispute as to any material fact with

---

[27] Id. (citing First National Bank of Arizona v. Cities Service Co., 391 U.S. 253 (1968)).

[28] Id. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)).

[29] Flores v. City of San Gabriel, 824 F.3d 890, 897 (9th Cir. 2016) (citing Ctr. for Bio-Ethical Reform, Inc. v. L.A. Cnty. Sheriff Dep't, 533 F.3d 780, 786 (9th Cir. 2008)).

[30] Anderson, 477 U.S. at 248.

[31] Id. at 249.

[32] Plaintiffs do not seek summary judgment on damages, but damages are not an element of an FCA claim. See United States ex rel. Hagood v. Sonoma Cnty. Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991) (citing Rex Trailer Co. v. United States, 350 U.S. 148, 152–53 & n.5 (1956)).

Case No. 3:07-cv-00215-SLG, United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.
Order re Cross Motions for Summary Judgment
Page 6 of 37

regard to any one element of each of Relators' claims, and that it is entitled to judgment as a matter of law on that element. And because Relators bear the burden of proof at trial, Honeywell may prevail at summary judgment if it shows that "there is an absence of evidence to support [Relators'] case."[33] If Honeywell meets that burden, the burden then shifts to Relators "to designate specific facts demonstrating the existence of genuine issues for trial."[34] For that reason, the Court will first address Honeywell's motion; for if Honeywell can show that Relators lack evidence to prove any one element of each of their claims even when adopting all justifiable inferences in favor of Relators, then Relators' motion necessarily fails.

## III. Summary of Claims

This case arises in the context of a complex statutory, regulatory, and contractual framework. For clarity, the Court will summarize Relators' theories before addressing the pending motions.

Relators seek to impose FCA liability based on a fraud-in-the-inducement theory.[35] Such a claim requires a showing that (1) Honeywell made a promise to the government that was false when made; (2) Honeywell knew the promise was false when made; (3) Honeywell's promise was material to the government's decision to award Honeywell the ESPCs at FRA in 2000, and the subsequent modification in 2003; and (4) there was a request for the government to pay out money or forfeit money

---

[33] *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).

[34] *Id.*

[35] *See* Docket 101 (SAC) at ¶¶ 1–3; Docket 225 at 37 ("Relators' claims are grounded on a fraud in the inducement theory of liability.").

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 7 of 37

due.[36]  Relators' basic claim is that in 2000 Honeywell promised the Army that it would produce certain savings through the ESPCs, that these savings promises were false, and that Honeywell knew they were false at the time the promises were made.[37] Relators then contend that Honeywell knew that once the promised savings failed to materialize the government would renegotiate the contracts rather than pay the roughly $50 million termination fee, and that thus the payments under the renegotiated contract were induced by the original fraud.[38]

As Relators themselves explain, the "savings guarantee" is derived from an equation.[39]  The task orders disclose that the equation, calculations, and data underlying the "savings" guarantee are provided in the "back-up data."[40]  In essence, the "savings guarantee," as reported in the task orders, was the difference between the "baseline" and the projected future costs: the "A" in $A = B - C$.  Relators' argument is that the baseline "B" was false, and that the projected costs "C" was false, and that Honeywell knew this to be so.  Relators have alleged four different falsehoods in

---

[36] *See United States ex rel. Hendow v Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006).

[37] *See* Docket 101 (Second Amended Complaint ("SAC")) at ¶¶ 43, 74; Docket 302-1 (Relators' Mot.) at 2 ("Honeywell obtained [the contracts] . . . through a materially false guarantee of cost-of-energy savings . . . .").

[38] *See* Docket 303-1 (Relators' Unredacted Opp.) at 45.

[39] *See* Docket 303-1 at 27–28.

[40] Docket 225-2 at 9 (Task Order 8); Docket 225-3 at 9 (Task Order 9).  Honeywell's 30(b)(6) witness testified that the "back-up data" referred to the proposals.  *See* Docket 265-19 (Rogan Dep.) at 3.

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 8 of 37

support of their claim that Honeywell artificially inflated the baseline costs and artificially deflated post-project costs.[41]

First, Relators assert that Honeywell "added future non-actual costs of electricity to the baseline"[42] and that Honeywell "improperly use[d] the future commercial cost of purchasing electricity as the pre-contract/pre-project cost of electricity energy baseline."[43] As discussed at greater length below, Honeywell calculated the baseline as if FRA had already begun purchasing electricity commercially, even though the CHPP had not yet shut down when the proposals were drafted and the task orders issued in 2000.

Second, Relators now claim in their summary judgment briefing (although so far as the Court can discern, this allegation does not appear in their Second Amended Complaint ("SAC")), that the "cost of energy savings guarantee [in the task orders] is demonstrably false as it excludes, for the post-project heat costs, the post-project/post-contract condition heat load costs for process loads and domestic hot water."[44]

Third, Relators contend that Honeywell's "proposal documents knowingly and fraudulently and falsely represented that normal Department of Energy infiltration factors had been used," but Honeywell had instead used an infiltration value that was

_____

[41] Relators' SAC contains additional allegations of improper baseline and costs calculations, *see, e.g.*, Docket 101 at ¶ 25 (allegations of false weather data), but they have not advanced those allegations at this stage in the proceedings. In their opposition to Honeywell's motion, Relators revive one allegation made in the SAC that was not raised in their own motion: that Honeywell misled the government as to the contract's legality. *See* Docket 101 at ¶ 72; Docket 303-1 (Relators' Opp.) at 13. That claim is discussed *infra*, section V.B.

[42] Docket 101 at ¶ 33.

[43] Docket 302-1 at 3.

[44] Docket 225 at 4.

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 9 of 37

"only two thirds of the 'tight' construction value." Relators maintain that the use of the wrong infiltration value resulted in "a significant understatement of defendants' post-project infiltration heat load requirement and grossly inflated energy savings."[45]

Fourth, Relators claim that Honeywell "failed to allow for adjustment of the baseline for buildings that were to be demolished" and that this resulted in an improper allocation of savings between Phase 1 and Phase 2 of the project.[46]

Defendants argue that Relators have not and cannot produce any evidence that Honeywell "knowingly" made any false statements to the government, and that therefore Honeywell is entitled to summary judgment.[47] With regard to the particular assertions of allegedly false statements, Honeywell contends that Relators' claims fail for the independent reason that Honeywell fully disclosed all of the relevant facts and assumptions in its proposals to the government. The Court will address each of Relator's four specific allegations in turn, but will first address the legal significance of the government's knowledge of Honeywell's calculations and data inputs in this False Claims Act proceeding.

---

[45] Docket 101 at ¶ 24; Docket 302-1 at 4; *see also* Docket 101 at ¶ 79(A).

[46] Docket 302-1 at 4; *see also* Docket 101 at ¶ 79(D). The project was divided into two phases. *See* Docket 223-22 at 6. "Phase 1" was "Proposal #3" and became Task Order 8. "Phase 2" was "Proposal #4" and became Task Order 9.

[47] *See* Docket 222 at 33–34.

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 10 of 37

## IV. The Government Knowledge "Defense"[48]

Honeywell contends that one reason Relators cannot prevail in this action is because Honeywell indisputably made extensive disclosures to the government about its underlying calculations and data inputs. Honeywell argues that because of these disclosures, Relators cannot show that Honeywell made knowingly false statements to the government.[49] According to Honeywell, the government's "knowledge of the facts underlying the alleged fraud negates the elements of knowledge and falsity."[50] Relators first counter that government knowledge "is irrelevant because Honeywell has admitted that it actually knew there would be no savings before it submitted the two false task order savings guarantees."[51] Relators also argue that "Honeywell failed to make full disclosure of the relevant information to the relevant government officials."[52]

The Court rejects the premise underlying Relators' first argument as unsupported by the record. There is no evidence in the record to support Relators' assertion that Honeywell knew there would be no savings from its proposed ECSMs. That assertion

---

[48] The Ninth Circuit rejected Honeywell's efforts to assert a government knowledge defense at the motion to dismiss stage, noting that "[t]he possibility that Honeywell may prevail at a later stage of this litigation under the so-called government knowledge defense to FCA liability does not support the conclusion that the Relators' complaint cannot be saved by an amendment. . . . [That 'defense'] is therefore appropriate 'at the summary judgment stage or after trial.'" *Berg v. Honeywell Int'l, Inc.*, 580 Fed. App'x 559, 560 (9th Cir. 2014) (quoting *United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 327 (9th Cir. 1995)). As the proceedings have now advanced to summary judgment, it is now appropriate to consider the government knowledge "defense" and the extensive evidence in the record related to that defense.

[49] *See* Docket 222 at 36–37.

[50] Docket 258 at 10.

[51] Docket 303-1 at 33.

[52] Docket 303-1 at 37.

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 11 of 37

rests on the deposition testimony of Suzanne Wunsch, a Honeywell employee involved in the contract negotiations with the government in 2000.[53] Although Ms. Wunsch did testify that "everyone knew" that "it would cost the government more for heat and electricity after the plant was closed than it was before,"[54] she also said that that was exactly what Honeywell told the government: "[T]hese slides show the government that although there will be savings generated, they will be paying more when they close the plant."[55] This second statement underscores the fact that Ms. Wunsch understood Honeywell's "savings guarantee" to be based on assumed parameters—one of which was that as a result of the CHPP closure FRA was going to pay more for electricity whether or not it accepted Honeywell's proposed ESPCs. Accordingly, Ms. Wunsch testified that Honeywell was "directed" to show the Army "what will it look like when the plant is closed."[56] These statements reflect Ms. Wunsch's belief that both Honeywell and the government were well aware that the privatization of FRA's electricity supply would have a negative impact on FRA's electricity costs. Ms. Wunsch's comment reflects her understanding that Honeywell's proposals were distinct from, and yet incorporated, FRA's plans to privatize its electricity supply. Honeywell's calculations of savings was determined within the context of FRA's independent plan to buy electricity

---

[53] *See* Docket 302-1 (Relators' Mot.) at 18. Ms. Wunsch now goes by Ms. Johnson, but consistent with the documents in evidence and the parties' briefing, the Court will refer to her as Ms. Wunsch.

[54] *See* Docket 265-18 (Wunsch Dep.) at 5.

[55] Docket 265-18 at 4.

[56] Docket 265-18 at 4. There is a dispute as to whether the Army actually directed Honeywell to make such an assumption, but as explained below, that dispute is immaterial. *See infra* note 96

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 12 of 37

from a commercial source.[57]   No reasonable jury could conclude that her statements reflect an admission that Honeywell knew that its baseline, its projected costs, or its "savings guarantee" were "false" within the meaning of the FCA.

Plaintiffs correctly observe that the Ninth Circuit has held that the fact that the "relevant government officials know of [a statement's] falsity is not in itself a defense."[58] But the Ninth Circuit has also repeatedly recognized that "knowledge possessed by officials of the United States may be highly relevant" at trial or at the summary judgment stage.[59]   Government knowledge may be "highly relevant" to two elements of an FCA claim.

First, government knowledge may be used to rebut the necessary scienter: If the contractor "so completely cooperated and shared all information" with the government, then the contractor "did not 'knowingly' submit false claims."[60]   In *United States ex rel. Butler v. Hughes Helicopters*, the relator alleged that the contractor selling helicopters to the Army had falsely certified compliance with agreed-upon testing parameters.   The contract called for certain testing procedures, but prior to testing the contractor "prepared Test Plans for the Army's approval" that "did not include all of the testing

---

[57] *See infra* note 99 and sources cited therein.

[58] *See United States ex rel. Hagood v. Sonoma Cnty. Water Agency* (*Hagood I*), 929 F.2d 1416, 1421 (9th Cir. 1991) (citing *United States v. Ehrlich*, 643 F.2d 634, 638–39 (9th Cir. 1981)).

[59] *Id.* at 1421.

[60] *United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 327 (9th Cir. 1995); *see also Hooper v. Lockheed Martin Corp.*, 688 F.3d 1037, 1051 (9th Cir. 2012); *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1995), *abrogated on other grounds*, *United States ex rel. Hartpence v. Kinetic Concepts, Inc.*, 792 F.3d 1121 (9th Cir. 2015).

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 13 of 37

referred to in the contract documents."[61]    The Army's technical representatives nonetheless recommended approval of the test plans, and the contracting officers signed off on them, apparently in recognition that less extensive testing was warranted "because of [the Army's] decision to speed up production."[62]    When the contractor delivered the helicopters, it signed forms "which stated that the helicopters conformed to contract."[63]    In affirming a directed verdict for the defendant–contractor on the relator's FCA claims, the Ninth Circuit assumed that the contractor's statements were "false,"[64] but nonetheless concluded that the extent of the government's knowledge negated a finding that there had been a "knowing" submission of a false claim.  As one example in that case, the contractor had represented that "pattern tests of the pilot's radio were done at 10 to 12 nautical miles," but they had actually been done at closer distances. As to that example, the Ninth Circuit held that because "the Army knew that the summary statement of the distances at which the pattern tests were conducted was not strictly accurate as to all the tests," and because "this discrepancy was the subject of dialogue between the Army and MDHC" the "only reasonable conclusion is that this was not a 'knowingly' false statement, as the noncomplying tests were known to and approved by the Army."[65]

---

[61] *Butler*, 71 F.3d at 324.

[62] *Id.*

[63] *Id.*

[64] *Id.* at 327.

[65] *Id.* at 328.

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 14 of 37

Similarly, in *Hooper v. Lockheed Martin Corp.*, the relator alleged that the contractor had used "defective testing procedures."[66]   The district court granted summary judgment to the contractor after concluding "that there was no evidence of fraud in the testing because the Air Force was aware of and approved Lockheed's testing methods, even if the tests were not done in the order specified in the contracts."[67]   The Ninth Circuit affirmed, holding that "where Lockheed submitted overwhelming evidence that it . . . disclosed to the Air Force its testing procedures," the FCA claim necessarily fails because the relator could not show that "Lockheed 'knowingly' submitted a false claim."[68]   Thus, Ninth Circuit authority establishes that the fact that a contractor has been open and candid with the government about the facts underlying its statements to the government can be used to show that the contractor did not have the requisite scienter.

Second, government knowledge may "show that the contract has been modified or that its intent has been clarified, and therefore that the claim submitted by the contractor was not 'false.'"[69]   As the Seventh Circuit has stated, "[i]f the government knows and approves of the particulars of a claim for payment before that claim is presented, the presenter cannot be said to have knowingly presented a fraudulent or false claim.  In such a case, the government's knowledge effectively negates the fraud

---

[66] 688 F.3d 1037, 1050 (9th Cir. 2012).

[67] *Id.* at 1050–51.

[68] *Id.* at 1051.

[69] *United States ex rel. Kreindler & Kreindler v. United Techs. Corp.*, 985 F.2d 1148, 1157 (2d Cir. 1993).

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 15 of 37

or falsity required by the FCA."[70]  In this context, government knowledge is used not to rebut an inference of scienter, but rather to define the scope of the statement which is alleged to be false.

Several district courts have taken the same view, recognizing that the context of a statement can negate its apparent falsity.  Thus, the district court in *Butler* found that the relator "did not provide legally sufficient evidence that, given the nature of the relationship between [the contractor] and the Army, any statements or claims made by [the contractor] were 'false or fraudulent.'"[71]  And in *Boisjoly v. Morton Thiokol, Inc.*, the district court examined the "close interplay" between the contractor and the government, and concluded that, given the government's detailed knowledge of the very defects that the relator alleged gave rise to an FCA claim, the relator could not prove "the element of falsity or fraud required."[72]

In affirming the district court's directed verdict in *Butler*, the Ninth Circuit applied this same logic.  In that case, the contractor had submitted a report that concluded that the helicopter radios "have been successfully demonstrated and are ready for production."  But in fact the radios had failed to meet certain contractual specifications. The Ninth Circuit held that because "the failure to meet specifications was detailed elsewhere in the report," the "generalized statement with added details was not the type

---

[70] *United States ex rel. Durcholz v. FKW Inc.*, 189 F.3d 542, 545 (7th Cir. 1999); *see also United States ex rel. Burlbaw v. Orenduff*, 548 F.3d 931, 952 n.19 (10th Cir. 2008).

[71] 1993 WL 841192 at *14 (C.D. Cal. Aug. 25, 1993) (granting directed verdict for defendant), *aff'd* 71 F.3d 321 (9th Cir. 1995).

[72] 706 F. Supp. 795, 809–10 (D. Utah 1988).  *Boisjoly* arose in the context of a motion to dismiss.  While the Ninth Circuit has rejected attempts to employ government knowledge at that stage, it has characterized *Boisjoly* as "defensible on its facts."  *Hagood I*, 929 F.2d at 1421.

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 16 of 37

of [false] representation required by the statute."[73]  Thus, the additional details provided in the report warranted the directed verdict for the contractor despite the conclusion's guarantees because no reasonable jury could conclude that a false statement had been made.

Honeywell maintains that the government's knowledge in this case is relevant for both of the reasons discussed above.  It contends that its open and collaborative discussions with government officials and the wide-ranging disclosures prior to the finalizing of the task orders defeat any claim that Honeywell knowingly made any false statement.  And Honeywell claims that its wide-ranging disclosures negate any claim that its statements were false.[74]  The Court will address the applicability of the government's knowledge in each of these two contexts for each of the Relators' specific claims as necessary.

## V. Specific Claims

### A. Baseline Inclusion of Future Non-Actual Costs of Electricity

Both the parties principally focus on Relators' first claim: that Honeywell misrepresented projected savings by assessing the baseline as though FRA were already purchasing electricity on the commercial market.[75]  The timing of the knowledge is critical: an FCA claim requires a false statement that is known to be false at the time the statement is made.[76]  Thus, for the asserted savings to be an actionable claim that

---

[73] *Butler*, 71 F.3d at 328.

[74] *See* Docket 258 at 10.

[75] *See, e.g.*, Docket 222 (Honeywell's Mem.) at 13–18; Docket 302-1 (Relators' Mem.) at 9–14.

[76] *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006) (quoting

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 17 of 37

survives summary judgment, there must be some evidence that Honeywell knew in 2000 that the savings it was projecting were inaccurate.[77]

But Relators have not presented any evidence that Honeywell possessed such knowledge at the time of the initial contracting in 2000. As discussed above, Ms. Wunsch's statement that "everyone knew" that shutting down the CHPP would increase electricity costs does not establish that Honeywell knew its baseline was improper.[78] And Honeywell executive Steve Craig's statement in 2006 that Honeywell knew "from the very beginning" that the project would not save energy[79] was wholly unrelated to the accuracy of the baseline.[80] As discussed in greater detail below, Mr. Craig's statement, in its full context and drawing all *reasonable* inferences in Relators' favor, was not that Honeywell knew there would not be any savings as a result of its energy savings measures, but rather that Honeywell knew there would not be any savings if certain actions were not taken to improve infiltration rates.[81] Finally, Relators suggest that Honeywell's expertise in ESPC contracts warrants an inference that it "knew" its

---

*United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996)).

[77] Some evidence suggests that there actually were substantial energy savings as a result of the ESPCs. *See, e.g.*, Docket 223-50 at 21–23 (Simmons June 27, 2008 Mem.). But whether savings were in fact realized from the project does not impact whether there was fraud in the inducement, and the Court need not decide the issue.

[78] *See supra* section IV.

[79] *See* Docket 53-1 (Berg Decl.) at 22, ¶ 44.

[80] *See* Docket 259-1 at 94 (Berg Dep.) ("As far as I know, as far as I can recollect, the telephone conference centered on heating and not on electrical.").

[81] *See infra* section V.C.

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 18 of 37

baseline was "improper."[82]   But Honeywell's expertise is not sufficient evidence to establish knowing fraud under the False Claims Act.[83]

Moreover, in this case Honeywell did not simply present a conclusory savings number to the government.   Rather, Honeywell provided extensive calculations to the government supporting its projected savings; and the government, after substantial discussion with Honeywell, approved those calculations.   The Court has reconstructed the following approximation of these calculations from the proposal documents:

First, Honeywell assessed FRA's energy usage based on fiscal years 1998 and 1999.[84]   At that time, most of FRA's heat and electricity was being provided by the CHPP.   The CHPP was a cogeneration plant, meaning that it burned fuel to produce steam; the steam first turned turbines to generate electricity and was then routed throughout the base to heat the buildings.   Honeywell then calculated the total cost of fuel to produce all of the steam.[85]   In consultation with Army personnel, Honeywell allocated the cost of generating the steam between electricity generation and heat production.[86]   This provided a cost for heat and a separate cost for electricity.[87]

---

[82] See, e.g., Docket 302-1 at 15–16, 21–22.

[83] Cf. Hopper, 91 F.3d at 1268 ("Hopper argues that past regulatory noncompliance creates an inference that the School District lied when certifying future compliance.  This is not sufficient evidence to establish knowing fraud under the [False Claims] Act.").

[84] See, e.g., Docket 265-5 at 39.

[85] See Docket 265-5 at 150 (Proposal #4).

[86] This percentage varied throughout the various proposals, apparently based on input from FRA employees.  See Docket 265-5 at 147 ("Plant Steam to Heating was recalculated using the formula provided by DPW.").

[87] In Proposal #4, Honeywell estimated this cost at $2,300,582 per year for electricity and at $2,214,681 for heat.  Docket 265-5 at 150–51.  In Proposal #3, Honeywell had estimated

Case No. 3:07-cv-00215-SLG, United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.
Order re Cross Motions for Summary Judgment
Page 19 of 37

Honeywell's proposals for Task Orders 8 and 9 each contained two proposed Energy Cost Savings Measures (ECSMs). First, Honeywell would install high-efficiency natural gas furnaces in each building and eliminate reliance on the CHPP for heating.[88] Honeywell estimated the cost of heating the buildings using the new furnaces, and presented the energy savings from that ECSM as the difference between that cost and the portion of steam costs that Honeywell had allocated to heating the buildings using the CHPP.[89] Second, Honeywell proposed installing "building management and control systems" that accounted for building occupancy by reducing heat supply during off-peak hours and optimized hot water systems.[90] For these measures, Honeywell used computer modeling software to project the energy consumption for each building with and without the control measures.[91] The reported energy savings was the difference between those two numbers. Combined, these two ECSMs were expected to produce $464,239 in annual heat energy savings for Task Order 8 and $580,689 for Task Order 9.[92]

---

$2,329,158 for electricity and $2,288,850 for heat. Docket 223-22 at 6.

[88] Docket 265-2 at 23 (Proposal #3).

[89] *See* Docket 265-2 at 27. The project was divided into two phases, with one-half of the heat costs assigned to each phase. *See* Docket 223-22 at 6.

[90] *See* Docket 223-20 at 161.

[91] Docket 223-20 at 163.

[92] *See* Docket 225-2 (Task Order 8) at 9; Docket 225-3 (Task Order 9) at 9. Task Order 8's savings are the sum of the savings from each proposed ECSM, $235,709 for the first, Docket 223-20 at 28, and $228,530 for the second, Docket 223-20 at 164. Task Order 9's savings are the sum of the savings from each ECSM, $522,941 for the first, Docket 265-5 at 54, and $57,748 for the second, Docket 223-26 at 46. Task Order 9 included additional "electric savings" of $245,681. Honeywell disclosed these savings separately, and reported that "These savings are a result of a phone conversation with Mr. Paul Knauff [an FRA employee] on

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 20 of 37

Thus, the savings that Honeywell presented were the results of the underlying calculations it disclosed: the difference between the cost associated with heating the buildings using the CHPP and the cost to heat the buildings after the CHPP was shut down. Honeywell was transparent about how it reached its numbers.

Of course, there was an additional consequence to shutting down the CHPP. Once the CHPP was shut down, FRA would need to purchase electricity from another source. Relators' claim is that Honeywell's projected savings number was "false" because Honeywell "improperly us[ed] the future commercial cost of purchasing electricity as the pre-contract/pre-project cost of electricity energy baseline."[93] Relators point to Honeywell's "Fuel Sensitivity Analysis," a spreadsheet that shows the dollar value of the *heat* savings projected for Task Order 8, which is identical to the dollar value of the *total* savings projected in Task Order 8.[94] According to Relators, this "conclusively proves that for the cost of energy savings in Task Order 8 . . . Honeywell only conducted a cost of energy savings regarding heat."[95] In essence, Relators argue that Honeywell should have deducted the increased costs of purchasing electricity from

_____

November 8, 2000." Docket 265-5 at 54; *see also* Docket 265-5 at 153 (explaining the calculations for these savings). This item of the savings calculation is not directly at issue in this case, though it is discussed in more detail below. The total savings projected for Task Order 9 was the sum of these three numbers, $826,370. There is a $2,000 discrepancy in the projected savings in the issued task order, *see* Docket 225-3 at 9 (estimating $828,370), but that discrepancy may be the result of an amendment to the estimated savings from the second ECSM: The estimates for the first were updated at some point, *compare* Docket 223-25 at 5, *with* Docket 265-5 at 54, but the Court was unable to locate in the record any corresponding update for the second ECSM estimates.

[93] Docket 302-1 at 3.

[94] *Compare* Docket 265-1 (Fuel Sensitivity Analysis) at 1, *with* Docket 225-2 (Task Order 8) at 9.

[95] Docket 302-1 at 35.

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 21 of 37

any energy savings number.  Honeywell does not dispute the contention that Task Order 8 contained only heat savings, but instead counters that it was transparent not only with regard to how it calculated savings, which looked only at heat costs, but also with regard to the fact that it was not including the increased costs of electricity.[96]

As Honeywell disclosed during a presentation with Army staff in February 2000 (several months before the task orders were issued), purchasing electricity commercially would cost more money than producing it at the CHPP.  In that presentation, Honeywell indicated that the then-current costs associated with generating electricity at the CHPP were $3,652,591 per year, and that the cost to buy the same amount of electricity commercially would be $4,544,027 per year.  In bold letters at the bottom of that slide, Honeywell indicated "Net Electric Cost Increase $891,437."[97]  And on the next slide, Honeywell showed how it intended to calculate the "Baseline Energy Costs."  The baseline would include the total energy costs associated with running the

---

[96] Relators identify a genuine dispute of fact as to whether Paul Knauff, an FRA employee, instructed Honeywell to account for the increased costs of electricity in this matter.  *See* Docket 241 (Relators' Opp.) at 18–19; Docket 241-5 (Knauff Dep.) at 3.  Paul Knauff's own deposition testimony directly contradicts Honeywell's 30(b)(6) witness, Richard Rogan.  *See* Docket 241-1 (Rogan Dep.) at 2–3.  Separate evidence might also support Honeywell's version of events if this case went to trial: an Army Audit Agency interview from 2003 indicates that Paul Knauff recalled that "electricity was never included in the project" and that "Honeywell briefed that information upfront when the project first started."  Docket 319-2 at 5.  But this statement is ambiguous as to what it meant that "electricity was never included," and the Court assumes, as it must for purposes of this motion, that Mr. Knauff was not referring to the baseline.  While such an instruction would have bolstered Honeywell's reliance on the government knowledge to defeat Relators' claims, it is not necessary to it.  The Court assumes for purposes of this motion that Mr. Knauff did not so instruct Honeywell, but the fact turns out to be immaterial: As the discussion in this section shows, Honeywell's repeated disclosures informed the government exactly how Honeywell was calculating the baseline and the savings, and so its reason for doing so in the first instance does not affect whether its baseline was "false" or whether any falsity was known to Honeywell at the time.

[97] Docket 265-12 at 12 (Feb. 29, 2000 IST Meeting Powerpoint).

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 22 of 37

CHPP in the past, the projected increase in costs when electricity was purchased, and the additional costs of the electricity that FRA was already purchasing. This gave the "Total Annual Baseline Energy Costs" of $8,378,738.[98] Thus, in February 2000, over six months before the first contract was formalized, Honeywell was clearly including the increased electrical costs of purchasing electricity in its electricity baseline, thereby indicating to the government that its energy savings calculations would not account for those increased costs.[99]

When Honeywell submitted its formal proposals in July 2000 (Proposal #3) and November 2000 (Proposal #4), it again indicated that the electricity baseline would be "adjusted" to account for the increased costs of purchasing electricity. Honeywell first calculated, "per the monthly plant operating reports," the CHPP's electrical production in megawatt-hours per year. It then added the electricity that FRA was currently purchasing to estimate CHPP's total electricity requirement. Then, under the bolded subtitle "Electrical Baseline Adjustment," Honeywell calculated how much it would cost

---

[98] Docket 265-12 at 13.

[99] As a consequence of this adjustment, the baseline was calculated as if FRA had stopped using the CHPP to produce electricity, but was still using it to produce heat. Thus, the ESPCs could account for the ancillary savings from shutting down the CHPP, such as avoided labor and maintenance costs, even though it did not account for the increased cost of electricity. Honeywell may have concluded that FRA was planning exactly this, since the privatization efforts were distinct from the ESPC. *See* Docket 225-8 (AAA Lessons Learned) at 13 (noting that FRA personnel "were under the impression the Army was getting out of the utility business, no matter what the cost, whether by privatizing or by the use of [ESPCs]"); Docket 223-41 at 7 (Charles Baus March 29, 2000 email) (discussing electrical privatization); Docket 223-38 at 44 (Simmons April 10, 2003 Mem.) ("USARAK [U.S. Army, Alaska] was proceeding with the understanding that the electrical system was going to be privatized."); Docket 319-2 at 2 ("At the time the project started, it was understood that electricity was to be purchased."); Docket 319-2 at 6 ("The intent of the ESPC was not to replace the power plant, but to replace the steam distribution system.").

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 23 of 37

to purchase the same amount of electricity commercially.[100]

The record also demonstrates that Honeywell knew that the government also knew about the electrical baseline adjustment. As part of the ESPC process, Honeywell submitted its calculations to the Army Corps of Engineers for review and approval. Tim Brown, one of the Army engineers reviewing the proposal documents, specifically commented to Honeywell with regard to the Electrical Baseline Adjustment that "[t]he analysis should include supportive information to demonstrate the actual electrical charges after the CH&PP is shut down."[101]

Relators argue that other parts of Honeywell's savings calculations show that it was misleading the government with regard to how it calculated the electricity costs. They note that one component of the savings guarantee for Task Order 9 was the "electrical savings" from shutting down the CHPP: The CHPP itself required electricity to power lights and various mechanical components in the CHPP building, and shutting it down would eliminate those requirements, reducing FRA's total electricity demand.[102] In evaluating these savings, Honeywell used the then-current costs to provide that electricity—the cost of generating the electricity using the CHPP—instead of the projected commercial rate. Relators argue that this fact demonstrates that the government believed baseline costs would be calculated using the CHPP's cost-to-

---

[100] Docket 265-5 at 42; *see also* 225-5 at 5.

[101] Docket 223-2 at 33–34.

[102] *See supra* note 92. This component is not directly at issue, and is distinct from the electrical baseline adjustment.

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 24 of 37

generate, rather than the commercial cost-to-buy.[103]  But the parties do not dispute that this specific component of the proposal was added at the behest of Paul Knauff, an FRA employee.[104]  Thus, whichever rate should have been used for this calculation, the fact that the Army personnel requested use of the CHPP's cost-to-generate rate negates Relators' assertion that Honeywell made a knowingly false statement to the government when it incorporated this request.

The Court agrees with Honeywell that, as a matter of law, its extensive disclosures to the government prior to the task orders' finalization preclude Relators' FCA claim.[105]  First, the stated energy savings were clearly calculated and identified as heat energy savings only.  Those numbers did not become "false" merely because they excluded electricity costs.[106]  The savings estimates were the result of clearly disclosed mathematical equations that did not even purport to include electricity costs.  Because Honeywell disclosed the assumptions and math underlying its estimates, its statements in that regard were not "false" within the meaning of the False Claims Act.[107]

---

[103] *See* Docket 302-1 at 13.

[104] *See* Docket 265-5 at 54; *see also* Docket 265-5 at 153 (explaining the calculations for these savings).  *Cf. supra* note 96 (detailing a dispute regarding a different instruction Honeywell contends Paul Knauff gave).

[105] Relators have focused substantial briefing on whether the baseline was permissible or proper under the applicable statutes and regulations.  But FCA liability does not attach to mere regulatory violations.  *See United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1171 (9th Cir. 2006).  Thus, the Court need not decide whether or not the applicable regulations allowed an ESPC to account for the electricity costs in the manner these ones did.  *See also infra* Part IV.

[106] Relators also argue that these numbers were inaccurate for other distinct reasons.  The Court addresses these allegations in the pages below.

[107] *Cf. United States ex rel. Butler v. Hughes Helicopters, Inc.*, 71 F.3d 321, 328 (9th Cir. 1995) (holding that "a generalized statement with added details was not the type of representation

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 25 of 37

Moreover, Honeywell's repeated disclosures to the government about the "Electrical Baseline Adjustment" preclude a finding that any statement in that regard was known to be false by Honeywell when made.[108]   Honeywell informed the government that it would cost more to buy electricity than to produce it.  It disclosed the basis for its energy savings calculations which clearly did not account for the increased electricity costs.  It communicated the electrical baseline adjustment to the government in both its formal proposals and in its less formal presentations.  It received comments from government employees about its adjustment calculations.  Honeywell "completely cooperated and shared all information" with the government, and thus "the Army knew" that the increased electrical costs were not accounted for and this fact "was the subject of dialogue between the Army and [Honeywell]."   Therefore, the "only reasonable conclusion is that this was not a 'knowingly' false statement, as the [calculations] were known to and approved by the Army." [109]

In light of the lack of evidence that Honeywell had any knowledge that the baseline was improper, and in light of the overwhelming evidence that Honeywell fully disclosed the baseline adjustment and the fact that its energy savings calculations did not account for the increased costs of electricity, the Court finds that there is no genuine dispute as to any material fact with regard to either the "falsity" of Honeywell's savings

required by the statute").

[108] Contemporaneous emails between Honeywell employees also rebut any suggestion that Honeywell "knew" the baseline to be "false."  In March 2000, Honeywell's Charles Baus emailed other Honeywell employees working on the FRA project, and stated that "we will be using the MLP Rate #760 to determine the baseline electric rate.  Again, the philosophy being that the electric system 'privatization' is proceeding without us and this is what they will be paying." Docket 223-41 at 7.

[109] *Butler*, 71 F.3d at 327–28.

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 26 of 37

estimates or Honeywell's knowledge of any alleged falsity. Accordingly, Honeywell is entitled to judgment as a matter of law on this claim. FCA liability cannot be premised on Honeywell's electrical baseline adjustment.

*B. Heat Costs*

Relators assert that Honeywell "improperly omitted the process loads and domestic hot water loads from the post-project heat costs."[110] Honeywell responds that the omission of process loads "was fully disclosed to the Government in the proposal documents."[111] But whether or not Honeywell fully disclosed this omission, Relators have not answered Honeywell's assertion that there is no evidence that the omission was made "knowingly." While Relators present evidence to demonstrate that these numbers were omitted,[112] Relators offer only a bare unsupported assertion that this omission was intentional.[113]

Relators suggest that Honeywell can be charged with "knowingly" submitting false claims because it failed to use due diligence to verify its submissions. But this argument fails for two reasons. First, Relators have not proffered any evidence that Honeywell did not use due diligence; they do not discuss at all what processes

---

[110] Docket 302-1 at 23.

[111] Docket 238 at 29.

[112] *See, e.g.*, Docket 302-1 at 38. The extent to which such an omission was wrongful is disputed. *Compare* Docket 238 (Honeywell Opp.) at 29 ("Relators' own expert agrees . . . that ESPC baseline calculations should <u>never</u> include process loads."), *with* Docket 302-1 at 36 (arguing that "Honeywell dropped the post-retrofit domestic hot water and process loads" in an attempt "to yield the false energy savings guarantee").

[113] *See* Docket 302-1 at 39 ("Honeywell's various and creative methods in cherry-picking values and strategically inserting or deleting them from baseline calculations was conscious and deliberate.").

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 27 of 37

Honeywell used (or did not use) to verify the submissions. They only repeatedly state what they view as mistakes in Honeywell's calculations. But if the fact of a mistake was sufficient to charge a sophisticated contractor with knowledge of that mistake, then the "knowingly" element of the False Claims Act would be vitiated entirely: every mistake that a contractor made in submitting claims would be transformed into a lie. This is plainly not the law, as "the common failings of engineers and other scientists are not culpable under the Act."[114]

Second, and more fundamentally, Relators' argument rests on an apparent misreading of *United States v. United Health Insurance Company*.[115] In that case, health insurers participated in a government program that paid the insurers a certain amount for each insured, based on the assessed "risk" associated with that patient. Because that risk—and accordingly the amount paid—was based on the number and types of diagnoses for each patient, an insurer received more money from the government for "sicker" patients than for healthier ones. The insurers allegedly implemented an internal program whereby they verified the diagnosis codes entered for each patient, but only corrected the codes when they had understated the diagnosis, and ignored diagnosing errors that overstated a patient's diagnosis. Over time, the insurers' patients appeared much sicker than they actually were, because only underdiagnoses were being corrected.[116]

---

[114] *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1995) (quoting *Wang v. FMC Corp.*, 975 F.2d 1412, 1421 (9th Cir. 1992)).

[115] *See* Docket 302-1 at 39 (citing *United States v. United Health Insurance Co.*, 2016 WL 7378731 at *2 (9th Cir. Aug. 10, 2016), *as amended on denial of r'hrg en banc*).

[116] *See* 2016 WL 7378731 at *2.

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 28 of 37

In reversing a district court's grant of the health insurers' motion to dismiss, the Ninth Circuit concluded that the alleged "one-sided retrospective review" was not a good faith attempt to verify the accuracy of the diagnosis codes, and thus, if the allegations were true, the insurers had falsely certified to the government that its submissions were "accurate, complete and truthful" based on the "best knowledge, information, and belief" of the insurers.[117]  But the relevant regulations did not require the insurers to implement a retrospective review at all; they merely required that, if the insurers did implement a retrospective review, it be carried out in good faith.[118]  And so the only requirement that *United Health Insurance* imposes is that if a contractor implements a submittal review process, it may not review their submittals in bad faith.

Here, Relators have not produced any evidence from which a jury could reasonably infer that Honeywell had implemented a one-sided review that was designed to correct only certain errors.  Even assuming that the omission of the process and hot-water loads was an error, the fact that an error occurred, standing alone, does not establish that Honeywell "knowingly" committed the error, even under a "reckless disregard" standard.  Honeywell has met its burden of "showing . . . that there is an absence of evidence to support [Relators'] case," and it is accordingly entitled to judgment as a matter of law on this claim.[119]

---

[117] *United Healthcare*, 2016 WL 7378731 at *9.

[118] *See United Healthcare*, 2016 WL 7378731 at *4.

[119] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 29 of 37

*C. Infiltration Rates*[120]

Relators alleged in their SAC that Honeywell "deliberately overwrote" software distributed by the Department of Energy ("DOE") for calculating a structure's passive heating loss.[121]  After this Court granted Honeywell's second motion to dismiss,[122] the Ninth Circuit reversed and remanded, finding that Relators' proposed SAC properly pled a fraud-in-the-inducement FCA claim.  The Ninth Circuit specifically noted Relators' allegation that Honeywell had "falsified its estimates . . . by overwriting Department of Energy software to include non-standard values for heat infiltration."[123]  In their motion for summary judgment, however, Relators present no evidence to support this allegation.  While there is evidence suggesting that Honeywell did in fact use infiltration rates lower than those recommended by DOE,[124] Relators have produced no evidence that Honeywell "overwrote" the software.  Instead, Relators now assert that Honeywell used artificially low projected infiltration rates for FRA's buildings, and that "Honeywell knew that the true infiltration rates for the buildings would result in a larger post-installation consumption of gas than the erroneous infiltration rates it had used for its guarantee of savings."[125]

---

[120] Infiltration rates refer to the "flow rate of outside air into a building" and are a measurement of heating efficiency.  *See* Docket 222 (Honeywell's Mem.) at 39.

[121] Docket 101 at ¶ 79(A).

[122] *See* Docket 84.

[123] *See Berg v. Honeywell Intern., Inc.*, 580 Fed. App'x 559, 559–60 (9th Cir. 2014).

[124] *See, e.g.*, Docket 101-2 (EMP2 Audit) at 44.

[125] Docket 302-1 at 31.

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 30 of 37

As part of its contract proposals, Honeywell estimated the infiltration rates that would exist during the period of contract performance. These infiltration rates were used to project the costs of providing gas heat to each building.[126] In its proposals, Honeywell used values between 0.15 and 0.3 ACH as the projected infiltration rates.[127] Honeywell later characterized these projections as "aggressive,"[128] and some of them do seem lower than DOE suggests should be used.[129] But an FCA claim requires not only a false statement, but also a showing that the defendant knew the statement to be false when it was made. Whether a projection—even an aggressive projection—of future infiltration rates could be "false" when made presents a conceptual conundrum. Relators cite to no evidence in the record upon which a reasonable jury could find that Honeywell knew its infiltration rate projections were false statements when it made them.

Relators also alleged in their SAC that Honeywell had misrepresented an infiltration rate of 0.15 as a "normal" rate.[130] At his deposition, Timothy Berg, one of the relators and an FRA employee, explained that he based this assertion on surveying forms completed by Honeywell personnel that were submitted with the contract

---

[126] *See* Docket 223-61 (Berg Dep.) at 27–29.

[127] *E.g.*, Docket 223-23 at 11. "ACH" refers to "air changes per hour," reflecting the insulation effectiveness of a building.

[128] Docket 265-16 (Honeywell Executive Briefing Powerpoint) at 4.

[129] *See* Docket 223-54 (DOE Manual) at 25 (recommending rates of 0.3 ACH for "tightly constructed buildings").

[130] Docket 101 at ¶ 24 ("The proposal documents knowingly and fraudulently and falsely represented that normal Department of Energy infiltration factors had been used.")

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 31 of 37

proposals.[131]  Those forms indicated that the buildings had "normal" infiltration rates.[132]

But as Mr. Berg testified, that assessment reflected "the surveyor's interpretation of how

they would rate this building" at the time of the survey, before the project had begun.[133]

Thus, the forms did not indicate that the projected 0.15 ACH infiltration rates were

"normal," but that the buildings' preexisting infiltration rates were normal.  In any event,

in their summary judgment briefing, Relators no longer press the assertion that

Honeywell misrepresented a 0.15 ACH infiltration rate as "normal."

Relators instead now argue that Honeywell knew that the 0.15 ACH infiltration

rates were impossible to achieve.  They base this claim on comments that Steve Craig,

a Honeywell executive, made during a July 25, 2006 conference call, six years after the

task orders were issued.  According to Relator Berg's recollection in 2010, during that

2006 conference call Mr. Craig "told everyone present that Honeywell knew the project

would never save energy and was not viable from the very beginning."[134]  Mr. Berg's

declaration, and the Relators in their briefing, also point to a memorandum written by

Randy Tyler, a government employee, two weeks after the July 2006 call.  But that

contemporaneous memorandum is at odds with Mr. Berg's later recollection.  In Mr.

Tyler's memorandum, he posits that Mr. Craig "stated that the reason the energy saving

for the project could not be realized was because of the infiltration and that this was due

to the building heating system controls and the occupants opening windows and doors

---

[131] *See* Docket 223-61 (Berg Dep.) at 28–29.

[132] *See, e.g.*, Docket 223-27 at 7.

[133] Docket 223-61 at 28.

[134] Docket 53-1 (Berg Decl.) at 22, ¶ 44.

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 32 of 37

in the buildings."[135]  According to Mr. Tyler, Mr. Craig contended that the government had agreed to take certain measures to improve the infiltration rates, and that "*without this work*, this project was not a viable project."[136]

Relators also cite to Mr. Smith's declaration to support this claim.[137]  But Mr. Smith's recollection does not offer additional support for Relators' assertion as to Honeywell's knowledge and beliefs in 2000.  For Mr. Smith's declaration states only that in 2006 Mr. Craig "admitted that the project would not save energy or money"; it does not suggest that Mr. Craig said anything regarding what Honeywell knew or believed in 2000.[138]

Although the Court views the evidence in the light most favorable to Relators and draws all reasonable inferences in their favor, those "inferences are limited to those upon which a reasonable jury might return a verdict."[139]  Mr. Craig's full statement does not support Relators' supposition that Honeywell knew the infiltration rates were "false" in 2000.  At most, the evidence suggests that attaining the infiltration rates Honeywell projected was essential to achieving savings, and those infiltration rate projections were not realized.  It may be that Honeywell later blamed this failure on the government, but whether responsibility for attaining the infiltration rates belonged to Honeywell or to the

---

[135] Docket 53-21 (Tyler Aug 7, 2006 Mem.) at 2–3.

[136] Docket 53-21 at 3 (emphasis added).

[137] *See* Docket 302-1 at 31–32.

[138] Docket 52 (Smith Decl.) at 13, ¶ 30.

[139] *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir. 1995) (citing *T.W. Elec. Servs. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987)).

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 33 of 37

government is simply irrelevant to whether the projection of low infiltration rates was knowingly false when it was made in 2000. Optimism, even ill-founded optimism, does not render a statement false.[140]

Mr. Berg's 2010 declaration is at odds with the extensive contemporaneous documentary evidence and is unsupported by any other evidence. It omits the essential context of Mr. Craig's 2006 statement—that the projected savings were conditioned on actions Honeywell believed the government would take—context that the Tyler memorandum provides. The Court finds that the declaration is insufficient to permit "a fair-minded jury [to] return a verdict for the plaintiff" on this claim, and that Honeywell is therefore entitled to judgment as a matter of law with regard to the infiltration claim.[141]

Honeywell also argues that it is entitled to summary judgment on this claim because it disclosed the infiltration rates it projected to the government.[142] But because the Court concludes that there is insufficient evidence to permit a reasonable jury to find the infiltration rates were knowingly false, it need not address whether any disclosure to the government of these rates also obviates any assertion that they were knowingly false.

---

[140] *See, e.g.*, *N. Telecom*, 52 F.3d at 815 ("[P]roof of mistakes 'is not evidence that one is a cheat,' and 'the common failings of engineers and other scientists are not culpable under the Act.'" (quoting *Wang v. FMC Corp.*, 975 F.2d 1412, 1420–21 (9th Cir. 1992)).

[141] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).

[142] *See* Docket 222 at 39–40; Docket 223-28 at 7 (Proposal #4); Docket 265-20 (Dalsfoist Dep.) at 7 ("The infiltration rates were provided to us.").

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 34 of 37

*D. Adjustment for Destruction of Buildings*

Relators assert that "Honeywell failed to allow for adjustment of the baseline for buildings that were to be demolished."[143]  Whether or not this is true, Relators do not allege, much less present evidence to support, that Honeywell did this "knowingly."[144] That is, although Relators allege that Honeywell made an error in calculating the baseline, they have not presented any evidence to demonstrate that any such error was intentional or "knowing."  The FCA does not impose liability for "innocent mistakes" or "mere negligent misrepresentations."[145]  Without such evidence, no reasonable jury could conclude that the omission was done "knowingly."

## IV. Relators' Opposition

Although Relators do not press the theory in their own motion for summary judgment, in their opposition to Honeywell's motion they revive their claim that Honeywell misrepresented the contracts as "legal" under the relevant ESPC statutes and regulations.[146]  But a legal assertion of this type cannot form the basis of an FCA claim.  While a false promise to comply with statutory or regulatory requirements might be sufficient to support an FCA claim,[147] Honeywell's proffered view of the legality of a

---

[143] Docket 302-1 at 4.

[144] Relators' briefing does not meaningfully address this issue, referencing the omission only in a few parentheticals.  *See* Docket 302-1 at 32, 34.  Relators do not raise the issue again in their reply or their opposition to Honeywell's summary judgment motion.

[145] *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174 (9th Cir. 2006) (quoting *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996)); *see also N. Telecom*, 52 F.3d at 815.

[146] *See* Docket 303-1 at 13.

[147] *E.g.*, *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1174–75 (9th Cir. 2006) (finding a plausible FCA claim premised on knowingly false assurances that the

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 35 of 37

contract is entirely different. For any such legal assertion is not a promise or statement of fact at all, so much as it is an opinion. Taking a position on a "disputed legal issue . . . is not enough to support a reasonable inference that [the claim] was *false* within the meaning of the False Claims Act."[148]

The government is just as well-situated (indeed, perhaps better situated) to assess the legality of government contracting in the complex world of the Anti-Deficiency Act and appropriations.[149] Because legal opinions can reasonably vary, they generally cannot constitute a "false" statement for purposes of the FCA. The Court "need not decide whether the defendants correctly interpreted [the applicable statutes] since a statement that a defendant makes based on a reasonable interpretation of a statute cannot support a claim under the FCA if there is no authoritative contrary interpretation of that statute."[150] Accordingly, Honeywell is entitled to summary judgment on such a claim if Relators intended to raise it.

## CONCLUSION

Upon review of the extensive exhibits and portions thereof cited by the parties, and drawing all reasonable inferences in Relators' favor, the Court concludes that Defendants have met their burden to show that there is no genuine dispute as to any material fact and that Defendants are entitled to judgment as a matter of law. As

contractor would follow the law).

[148] *Hagood II*, 81 F.3d at 1477 (emphasis in original).

[149] *See United States ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 288 (4th Cir. 2002) (noting that the government "had at least as much knowledge" as the contractor-defendant "regarding Congressional authority for the [challenged conduct]").

[150] *United States ex rel. Hixson v. Health Mgmt. Sys., Inc.*, 613 F.3d 1186, 1190 (8th Cir. 2010).

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 36 of 37

detailed above, Relators have not presented sufficient evidence from which a reasonable jury could return a verdict in their favor. Defendants have demonstrated that Relators cannot show that a triable issue exists as to whether Honeywell made a false statement in 2000 which it knew to be false at that time. For this reason, Honeywell is entitled to summary judgment on Relators' fraud-in-the-inducement claim. Because the Court grants summary judgment to Defendants, it will deny Relators' motion for partial summary judgment.

Therefore, IT IS ORDERED that Defendants' Motion for Summary Judgment at Docket 220 is GRANTED. Relators' Motion for Partial Summary Judgment at Docket 225 is DENIED.

All other pending motions are DENIED as moot. The final pretrial conference scheduled for January 9, 2017 and the trial scheduled to commence January 23, 2017 are VACATED. The Clerk of Court is directed to enter a judgment accordingly.

DATED this 29th day of December, 2016 at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE

Case No. 3:07-cv-00215-SLG, *United States ex rel. Berg et al. v. Honeywell Int'l, Inc. et al.*
Order re Cross Motions for Summary Judgment
Page 37 of 37